**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

TONY TERRELL GOLDEN,

    Defendant.

No. CR 09-4039-MWB

**MEMORANDUM OPINION AND ORDER REGARDING SENTENCING**

_____

**TABLE OF CONTENTS**

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A. Indictment And Guilty Pleas* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B. The Presentence Investigation Report* . . . . . . . . . . . . . . . . . . . . 4
   *C. Golden's Motion For Downward Variance* . . . . . . . . . . . . . . . . . 7
   *D. The Sentence Imposed* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   *A. The Appropriate Crack-To-Powder Ratio* . . . . . . . . . . . . . . . . . . 9
   *B. The Appropriate Sentencing Methodology* . . . . . . . . . . . . . . . . 11
   *C. Application Of The Methodology* . . . . . . . . . . . . . . . . . . . . . 13
      *1. The "standard" guidelines calculation* . . . . . . . . . . . . . . . 13
      *2. The "alternative" guidelines calculation* . . . . . . . . . . . . . 14
      *3. Consideration of the § 3553(a) factors* . . . . . . . . . . . . . . 14

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Defendant Tony Terrell Golden came before me for sentencing on January 5, 2010, on his guilty plea to two crack cocaine charges. Although this written ruling reiterates my categorical rejection, on policy grounds, of the 100:1 crack-to-powder ratio for sentencing under the United States Sentencing Guidelines and my determination that a 1:1 crack-to-powder ratio is appropriate, *see United States v. Gully*, 619 F. Supp. 2d 633 (N.D. Iowa 2009), that reiteration is not the primary purpose of this written ruling. Rather, I enter this written ruling, because this case—in which the defendant's criminal history includes a state conviction for first-degree attempted murder, apparently arising from a crack deal gone bad—demonstrates vividly why I believe that the determination of the crack-to-powder ratio should be separated from other sentencing considerations, such as a defendant's history of drug-related violence, for which the quantity ratio has long been used as a proxy.

## *I. INTRODUCTION*

### *A. Indictment And Guilty Pleas*

On July 23, 2009, a Grand Jury handed down an Indictment (docket no. 1) charging defendant Tony Terrell Golden with the following offenses: (1) conspiring, from about 2004 through June 26, 2009, to distribute 50 grams or more of crack cocaine in violation of 21 U.S.C. § 846 (**Count 1**); (2) possessing with intent to distribute 50 grams or more of crack cocaine on or about June 26, 2009, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) (**Count 2**); and (3) distributing 2.6 grams of crack cocaine within 1,000 feet of a public playground or school on or about June 3, 2009, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 860(a) (**Count 3**). Although Golden had already been

under investigation for drug trafficking,[1] Golden was not arrested until he was stopped by an Iowa State Trooper for a traffic violation on June 26, 2009. A vehicle search after that stop revealed five individually-wrapped bags, four containing crack cocaine and one containing cocaine powder, underneath the rear seat of the vehicle that Golden was driving. During a post-Miranda interview, Golden reported that he purchased three and one-half ounces of crack cocaine and one ounce of powder cocaine in Arkansas, where he lived with his mother, for $1,200 per ounce, and that he planned to sell the drugs in Sioux City, Iowa, where his father lived, at a considerable profit. He also described to officers how he could either cook the powder cocaine into crack cocaine or sell it to customers in powder form. Further interviews and debriefing, as well as prior investigation, revealed that Golden had traveled from Arkansas to Sioux City on several occasions to sell crack cocaine that he had purchased in Arkansas. At least some of the drug-trafficking activity at issue occurred within 1,000 feet of a playground or school.

On July 31, 2009, Golden entered a Written Waiver Of Personal Appearance At Arraignment in which he pleaded not guilty to the charges against him, and Chief United States Magistrate Judge Paul A. Zoss accepted Golden's waiver and directed entry of his not guilty pleas. *See* docket no. 4. Trial on the charges against Golden was eventually set for November 2, 2009. *See* Orders (docket nos. 6 & 8). However, on October 13, 2009, the trial was stricken and a change-of-plea hearing was set for October 16, 2009. *See* Order (docket no. 9). On October 16, 2009, Golden entered a Consent To Plead Guilty Before A Magistrate Judge and Rule 32 Waiver (docket no. 11). On October 16, 2009, Golden pleaded guilty to **Counts 1** and **2** before Judge Zoss pursuant to a plea agreement

---

[1]The charge in **Count 3** arose from a "controlled buy" on or about June 3, 2009, by a confidential informant.

providing, *inter alia*, for dismissal of **Count 3**. That same day, Judge Zoss filed a Report and Recommendation Concerning Plea Of Guilty (docket no. 13), recommending that the court accept Golden's guilty plea. On November 2, 2009, I accepted Judge Zoss's recommendation and accepted Golden's guilty pleas to **Counts 1** and **2**.

### B. *The Presentence Investigation Report*

Among other significant matters, the final Presentence Investigation Report (PSIR) (docket no. 22), filed December 29, 2009, summarized the relevant drug quantities in this case as 335.62 grams of crack cocaine (6,712.40 kilograms of marijuana equivalent) and 28.35 grams of powder cocaine (5.67 kilograms of marijuana equivalent), resulting in a converted combined weight of 6,718.07 kilograms of marijuana equivalent. *See* PSIR, ¶ 23. Consequently, the PSIR calculated Golden's Base Offense Level as 33, as follows: a Base Offense Level of 34 pursuant to U.S.S.G. § 2D1.1(c)(3), based on at least 3,000 kilograms but less than 10,000 kilograms of marijuana equivalent; a two-level reduction pursuant to U.S.S.G. § 2D1.1, comment n. 10(D), because the offense involved crack cocaine and other controlled substances; and a one-level increase pursuant to U.S.S.G. § 2D1.2(a)(2) for drug offenses committed near a protected location. PSIR, ¶ 29. The PSIR also recommended a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and, if the prosecution so moved, a further one-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(b), resulting in a Total Offense Level of 30.

The criminal history portion of the PSIR revealed no known juvenile adjudications, but four adult criminal convictions: (1) a conviction for "possession of cocaine" in Mississippi County, Arkansas, arising from an arrest on March 12, 1998, when the defendant was 17, and resulting in a sentence on April 24, 1998, to 3 years of probation;

(2) a conviction for "failure to appear," also in Mississippi County, Arkansas, arising from an arrest on May 17, 2000, when the defendant was 19, resulting in a fine imposed on May 18, 2000; (3) a conviction for first-degree attempted murder in Mississippi County, Arkansas, arising from an arrest on November 16, 2000, when the defendant was 20, and resulting in a sentence on May 16, 2001, to 120 months of imprisonment, from which Golden was subsequently paroled three times; and (4) a conviction for third-degree burglary in Mississippi County, Arkansas, arising from an arrest on March 5, 2001, when the defendant was 20, and resulting in a sentence on March 14, 2001, to sixty days in jail. PSIR, ¶¶ 40-43.

Not surprisingly, the conviction for first-degree attempted murder drew my particular attention. The PSIR described that offense as follows:

> Osceola Police Department records indicate officers were called to a street intersection due to shots fired. It was reported that the defendant, Reggie Jackson, Marquette Smith, and Sedrick Askew were involved in an altercation with Scotty Ridley and Anthony Harris. The defendant and Ridley escalated into a physical argument. Ridley pulled a gun from the defendant's pocket; however, the defendant out muscled Ridley and took the gun back. As Ridley walked backwards from the defendant, he taunted the defendant. The defendant then fired the gun at Ridley. At the crime scene, officers recovered over 40 grams of crack cocaine but never located the firearm. Ridley was hospitalized for his injuries
>
> While incarcerated, the defendant received disciplinary action and/or loss of good time for: failure to obey staff (16 times), assault (six times), unexcused absence from work schedule (five times), battery (three times), abusive/obscene language (three times), out of place of assignment (three times), unnecessary noise (two times), interfering with count (two times), unauthorized presence, keep person/quarters within

>regulation, lying to staff member, indecent exposure, counterfeiting/forging, possession/introduction of clothing, and any felony act or misdemeanor. During a July 1, 2009, debriefing, the defendant admitted he purchased one ounce of marijuana from a prison guard while incarcerated.

PSIR, ¶ 42. The PSIR also explained that Golden was sentenced to 120 months of imprisonment on this offense on May 16, 2001; he was paroled on October 14, 2004; his parole was revoked on January 1, 2005; he was paroled again on March 1, 2006; his parole was revoked again on February 5, 2007; he was paroled for a third time on December 12, 2008; and a parole warrant, still active, was issued on July 30, 2009. *Id.*

In his December 10, 2009, Objections To The Presentence Investigation Report (docket no. 19), Golden states the following objection to paragraph 42: "Defendant objects to the factual allegations contained in the criminal history portion under this paragraph, and alleges that these allegations are not correct." In response, the probation officer noted that the information in paragraph 42 was taken from the records of the Osceola Police Department and the Arkansas Department of Corrections, that, owing to the vague nature of the objection, the probation officer was uncertain what facts Golden was contesting, and that the PSIR was not amended in light of the objection.

The criminal history calculation in the PSIR gave Golden a subtotal of six criminal history points: three for the first-degree attempted murder conviction, two for the burglary conviction, one for the possession of cocaine conviction, and none for the failure to appear conviction. PSIR, ¶ 40-43. The PSIR then gave Golden two points pursuant to U.S.S.G. § 4A1.1(d) for committing the federal offenses while on parole for the attempted murder conviction, and one further point pursuant to U.S.S.G. § 4A1.1(e) for commission of the federal offenses less than two years following Golden's most recent release from custody

on the attempted murder conviction, resulting in a total of nine criminal history points, and a Criminal History Category of IV. PSIR, ¶¶ 44-46.

The PSIR concluded that, with a Total Offense Level of 30 and a Criminal History Category of IV, Golden's advisory guidelines sentencing range was 135 to 168 months, with the sentence for **Counts 1** and **2** to be imposed concurrently pursuant to U.S.S.G. § 5G1.2(c). PSIR, ¶ 72.

### C. *Golden's Motion For Downward Variance*

On December 23, 2009, Golden filed a Motion For Downward Variance (docket no. 21) pursuant to 18 U.S.C. § 3553(a), based entirely on the crack-to-powder disparity. Golden argued that using a 1:1 ratio would be more appropriate and that his Base Offense Level, doing so, would be only 23. More specifically, he argued that his Base Offense Level would be 22, pursuant to U.S.S.G. § 2D1.1(c)(9), for 363.61 grams of cocaine (at least 300 grams, but less than 400 grams of cocaine); there would be no conversion to marijuana equivalents and no reduction for crack cocaine as one of two or more drugs involved in the offense; but there would still be a one-level enhancement pursuant to U.S.S.G. § 2D1.1.2(a)(2) for conduct near a protected location. He argued that, with a three-level reduction for acceptance of responsibility, as recommended in the PSIR, his Total Offense Level would be 20, which, with a Criminal History Category of IV, would result in an advisory guidelines sentencing range of only 51 to 63 months. He acknowledged that there is a mandatory minimum sentence of 120 months for the amount of crack cocaine involved. Therefore, he asserted that the court should vary downward to the mandatory minimum sentence.

In its Response (docket no. 24), the prosecution argued that, while new Department of Justice guidelines now require prosecutors to inform the court that the Department of

Justice believes that Congress and the United States Sentencing Commission should eliminate the crack-to-powder disparity, a downward variance is not appropriate in this case owing to other case-specific aggravating factors, such as Golden's past history of violence, and his past and current involvement in drug trafficking. At the sentencing hearing, the prosecution declined to take any position on what sentence within the advisory guidelines range would be appropriate in this case, asserting that any sentence from 135 to 168 months would be reasonable.

### D. *The Sentence Imposed*

I reiterated at Golden's sentencing hearing my categorical rejection of the 100:1 crack-to-powder ratio set out in U.S.S.G. § 2D1.1, note 10, for all of the reasons stated in my decision in *United States v. Gully*, 619 F. Supp. 2d 633 (N.D. Iowa 2009), and that I would have varied downward to the statutory mandatory minimum sentence on that basis in the absence of other pertinent factors, but I nevertheless denied Golden's Motion For Downward Variance. Instead, I varied *upward* from the advisory guidelines range of 135 to 168 months (or from the statutory mandatory minimum that would have "trumped" the "alternative" guidelines range of 51 to 63 months, based on a 1:1 crack-to-powder ratio), and imposed a sentence of 180 months, with various other terms and conditions set out on the record at the sentencing hearing. My upward variance was based primarily on Golden's criminal history, including his conviction for first-degree attempted murder in circumstances suggesting a crack deal gone bad. I will now explain more fully the reasons for my variance, explaining in the process why I believe that this case demonstrates that the determination of the crack-to-powder ratio should be separated from other sentencing considerations—such as the various kinds of harm and violence that may or may not come

with trafficking of crack cocaine in a particular case—for which the quantity ratio has long been used as a proxy.

## II. LEGAL ANALYSIS

### A. *The Appropriate Crack-To-Powder Ratio*

As I explained in more detail in my ruling in *Gully*, a particular guideline may be rejected on categorical, policy grounds, even in a "mine-run" case, and not simply based on an individualized determination that it yields an excessive sentence in a particular case. *Gully*, 619 F. Supp. 2d at 637 (citing *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1104-06 (N.D. Iowa 2009), in turn citing *Spears v. United States*, ___ U.S. ___, 129 S. Ct. 840, 842-43 (2009) (*per curiam*)). In other words, the court may reject the 100:1 crack-to-powder ratio set out in U.S.S.G. § 2D1.1, note 10, on policy grounds, in every case, not just in a particular case on the basis that it yields an excessive sentence in that case. I reiterate that conclusion here.

Moreover, I again find that it is appropriate to reject the 100:1 crack-to-powder ratio in U.S.S.G. § 2D1.1, note 10, categorically, on policy grounds, for several reasons: The 100:1 ratio does not exemplify the Sentencing Commission's exercise of its characteristic institutional role of employing an empirical approach based on data about past sentencing practices to develop sentencing guidelines, but is the result of congressional mandates that interfere with and undermine the work of the Sentencing Commission; the assumptions about the relative harmfulness of crack cocaine and powder cocaine and the harms that come with trafficking in those controlled substances are not supported by recent research and data; the 100:1 ratio is inconsistent with the goals of the 1986 Act, because it tends to punish low-level crack traffickers more severely than major traffickers in powder cocaine; and its disproportionate impact on black offenders fosters disrespect for

9

and lack of confidence in the criminal justice system. *Id*. at 641 (citing *Spears*, ___ U.S. at ___, 129 S. Ct. at 843, and *Kimbrough*, 552 U.S. at ___, 128 S. Ct. at 567-68). In *Gully*, I noted, further,

> [E]ven if crack is more addictive than powder, and even if crack offenses are more likely to involve weapons or bodily injury or to be associated with higher levels of crime, *see [Kimbrough*, 552 U.S. at ___, 128 S. Ct. at 568]*, the 100:1 ratio is a remarkably blunt instrument to address those effects, because it simply assumes that the quantity ratio can be a proxy for these other harms, instead of basing the punishment on the additional criminal effects and use of weapons *when they are present in a particular case*. In addition, the relative ease with which powder cocaine can be converted to crack cocaine, which, among other things, allows sentences to be dramatically affected by when government officials decide to seize and arrest drug dealers, *see* United States Sentencing Commission, Special Report to Congress: Cocaine and Federal Sentencing Policy (April 1997) at 3-8, strongly suggests that the distinctions between the two controlled substances are artificial, at best.

*Gully*, 619 F. Supp. 2d at 641 (emphasis in the original). In my view, "the appropriate course is to treat interchangeable forms of cocaine as equivalents, and to enhance punishment when additional criminal effects and use of weapons, for example, are present in a particular case." *Id*.

I have found no contrary convincing argument since I filed my ruling in *Gully*. Therefore, I reiterate my categorical rejection, on policy grounds, of the 100:1 crack-to-powder ratio.

10

### B. *The Appropriate Sentencing Methodology*

In *Gully*, I next considered the appropriate reasoned alternative methodology for sentencing in light of my rejection of the Sentencing Guidelines provisions for crack cases. In *Gully*, I found,

> [T]he appropriate method is to calculate the guideline range under existing law (*i.e.*, using the 100:1 ratio and any appropriate guideline adjustments or departures), but then to calculate an alternative guideline range using a 1:1 ratio, and to use or vary from that alternative guideline range depending upon the court's consideration of the 18 U.S.C. § 3553(a) factors to account, for example, for the defendant's history of violence, the presence of firearms, or the defendant's recidivism.

*Gully*, 619 F. Supp. 2d at 644. I opined that this method uses "a readily ascertainable guideline range based on a 1:1 ratio, after rejecting the 100:1 guideline ratio on policy grounds," but then permits the court to "vary based on case- or defendant-specific factors pursuant to 18 U.S.C. § 3553(a), instead of varying (probably downward) some unpredictable amount from the 100:1 ratio guideline range based, in part, on rejection of the 100:1 guideline ratio on policy grounds, with the ultimate crack-to-powder ratio obscured by consideration of other factors." *Id.* at 644-45.

As I suggested at the outset, Golden's case demonstrates why this methodology—embodying a categorical rejection of the 100:1 crack-to-powder ratio, use of a 1:1 ratio, and adjustments to the resulting sentence in light of a case-specific consideration of the § 3553(a) factors—is appropriate. First, Golden indicated in his post-arrest statements that he could either cook the powder cocaine he brought from Arkansas into crack cocaine or sell it to customers in powder form, demonstrating the ready "convertibility" of the two forms of cocaine, making a differentiation between them for

11

sentencing purposes artificial at best. *See id.* at 641 (noting that the convertibility of powder to crack undermined the reasoning behind the 100:1 crack-to-powder ratio).

Second, if the crack-to-powder ratio and the § 3553(a) factors were not considered separately, there would presumably be some case-driven selection of the crack-to-powder ratio to account for case-specific factors, including, in this case, the defendant's history of drug-related violence. But where on a sliding scale of ratios should the sentencing court pin the ratio for a particular case? Where the Sentencing Commission and the Department of Justice now agree that a 1:1 ratio is appropriate, because the supposed differences between crack and powder cocaine in terms of, for example, drug-related violence *generally*, do not exist and, therefore, do not warrant any disparity in the ratio, there is something strange about reintroducing some other ratio as a proxy for *case-specific* drug-related violence.

Third, adjusting the crack-to-powder ratio in each case to some point on a sliding scale from 1:1 to 100:1 "skews" the rest of the guidelines calculations, as the defendant gains or loses relatively more or less for such things as acceptance of responsibility and conduct near a protected location depending on where the crack-to-powder ratio lands him. Balancing these collateral effects of the crack-to-powder ratio could become a nightmare, or at the very least, a sort of voodoo sentencing methodology.

Finally, even a 100:1 crack-to-powder ratio might not (and in this case, does not) result in a sufficient sentence, so that the sentencing court might have to go through another step to determine how much to vary from the guidelines sentencing range produced by the selected crack-to-powder ratio in light of the § 3553(a) factors, but the consideration of the § 3553(a) factors would be "skewed" by the prior adjustment to the crack-to-powder ratio. For example, in my view, it would make little sense intellectually or otherwise to adjust the crack-to-powder ratio for a violent offender to, say, 20:1, then make no upward

variance or only a relatively small upward variance upon consideration of the § 3553(a) factors, which expressly include consideration of the defendant's history of violence, where one might otherwise make a much larger upward variance upon consideration of the § 3553(a) factors for the same history of violence for a non-crack offender.

As a matter of both clarity, intellectual honesty, and potential consistency among defendants, it seems to me that the appropriate course is to use consistently a 1:1 crack-to-powder ratio, then make appropriate adjustments to a defendant's sentence in light of case-specific factors pursuant to § 3553(a).

### C. Application Of The Methodology

#### 1. The "standard" guidelines calculation

In this case, as in *Gully*, 619 F. Supp. 2d at 645-46, I first calculated Golden's advisory sentencing guideline range based on the quantities of powder and crack cocaine that I actually found, using a 100:1 ratio under the current Guidelines, and then considered whether any adjustments or departures from that guideline range were appropriate. Specifically, I imposed a one-level increase pursuant to U.S.S.G. § 2D1.2(a)(2) for drug offenses committed near a protected location, and granted a three-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and (b). These calculations resulted in a "standard" guidelines Total Offense Level of 30, which, with a Criminal History Category of IV, resulted in a "standard" advisory guidelines sentencing range of 135 to 168 months, with the sentence for **Counts 1** and **2** to be imposed concurrently pursuant to U.S.S.G. § 5G1.2(c).

### 2. *The "alternative" guidelines calculation*

Next, I determined Golden's "alternative" guidelines sentencing range, using a 1:1 crack-to-powder ratio. As defense counsel had argued, that "alternative" calculation, using the same adjustments for conduct near a protected location and acceptance of responsibility, resulted in a Total Offense Level of 20, which, with a Criminal History Category of IV, would result in an advisory guidelines sentencing range of only 51 to 63 months, but "trumped" by a statutory mandatory minimum sentence of 120 months for the amount of crack cocaine involved.

### 3. *Consideration of the § 3553(a) factors*

Finally, I considered the 18 U.S.C. § 3553(a) factors to determine what sentence was sufficient, but not greater than necessary to serve the purposes of sentencing. 18 U.S.C. § 3553(a). Specifically, the first § 3553(a) factor requires the court to consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The most significant matter in the history and characteristics of defendant Golden is his conviction for first-degree attempted murder in a drug-related context, described in paragraph 42 of the PSIR.

I acknowledge that Golden objected, at least generally, to the part of the PSIR regarding the attempted murder conviction and prison disciplinary reports while incarcerated for that offense. Although defense counsel suggested that he is required to make no more than general challenges to factual allegations in the PSIR, the Eighth Circuit Court of Appeals has imposed a more stringent standard:

> "'[U]nless a defendant objects to a specific factual allegation contained in the PSR, the court may accept that fact as true for sentencing purposes.'" *United States v. Razo-Guerra,* 534 F.3d 970, 975 (8th Cir. 2008) (quoting *United States v. Moser,* 168 F.3d 1130, 1132 (8th Cir. 1999)).

> "When the defendant so objects and the relevant responsive evidence has not already been produced at trial, 'the government must present evidence at the sentencing hearing to prove the existence of the disputed facts.'" *United States v. Wintermute,* 443 F.3d 993, 1005 (8th Cir. 2006) (quoting *United States v. Poor Bear,* 359 F.3d 1038, 1041 (8th Cir. 2004)). *"[W]e require that objections to the PSR be made 'with specificity and clarity' before a district court is precluded from relying on the factual statements contained in the PSR." Razo-Guerra,* 534 F.3d at 976 (citing *United States v. Wajda,* 1 F.3d 731, 732 (8th Cir. 1993)). *The reason we require specific objections is "to put the Government on notice of the challenged facts" which the government will need to prove at the sentencing hearing. Id. (internal citation omitted).*

*United States v. Davis*, 583 F.3d 1081, 1095 (8th Cir. 2009) (emphasis added). Here, defendant's objection to the portion of the PSIR regarding his attempted murder conviction—that he "objects to the factual allegations contained in the criminal history portion under this paragraph, and alleges that these allegations are not correct"— lacks the necessary "specificity and clarity" to put the prosecution on notice of the challenged facts. Defense counsel asserted that his objection did *not* relate to the parole history for the attempted murder offense stated in paragraph 42, but *did* relate to the recitation of prison disciplinary violations following the attempted murder conviction, *as well as* to the recitation of the facts concerning the attempted murder. As I indicated at the sentencing hearing, I do not think that Golden's objection can reasonably be read to relate to the recitation of prison disciplinary violations while incarcerated for the attempted murder conviction, because that recitation is not "in the criminal history portion under this paragraph."[2] Moreover, Golden's objection does not identify what specific factual

---

[2] As I also noted at the sentencing hearing, where Golden intended to object to the
(continued…)

allegations about the circumstances of the offense Golden was challenging. As such, I believe that I am entitled to, and I do, accept as true all of the facts in paragraph 42 of the PSIR, both facts concerning the attempted murder offense and facts concerning the prison disciplinary records. *See id.* In addition, the prosecution's evidence about the attempted murder offense, consisting of police records, is more than sufficient to establish the factual accuracy of the PSIR's recitation of the circumstances of that offense, even if I had sustained Golden's objection.

In short, but for Golden's poor aim, he would likely be serving a life sentence for murder in circumstances in which 40 grams of crack cocaine were found at the scene of an argument and shooting. The assessment of a mere three criminal history points to such an attempted murder offense, even if it also resulted in the assessment of other criminal history points for commission of the present federal offense while on parole and within two years of Golden's most recent incarceration, is woefully inadequate. Pursuant to U.S.S.G. § 4A1.1(a), the same three points would have been assessed for felony check fraud. I cannot conceive that a reasonable person would find equating attempted murder with felony check fraud makes sense in the assessment of criminal history for sentencing purposes.

I find it equally bewildering that the prosecution made no attempt to seek an upward variance based on this defendant's criminal history. Here, the prosecutor did not even suggest a sentence at the middle or the top end of the "standard" guidelines range, but was

---

$^2$(…continued)
entirety of a criminal history paragraph in the PSIR, his objection stated that he "objects to the factual allegations contained in that paragraph [47] regarding other arrests" and that he "objects to the factual allegations contained in that paragraph [48]." *See* Defendant's Objections To Presentence Investigation Report (docket no. 19). It would be anomalous to read what appears to be a more restricted objection to paragraph 42 as broadly as the objections to paragraph 47 and 48.

content to assert that a sentence anywhere within that guidelines range would be reasonable. When specifically asked, the prosecutor indicated that a sentence at the bottom of the advisory guidelines range would be reasonable in this case. I simply do not agree.

There are other aggravating factors in Golden's history and characteristics: his lack of employment history itself suggesting that he was making a living dealing drugs and his repeated parole revocations suggesting recidivism and the likelihood that he would reoffend unless incarcerated, all mitigated only by some inadequacies of his family relationships.[3] More specifically, I believe that an upward variance is also appropriate "to promote respect for the law," § 3553(a)(2)(A), "to afford adequate deterrence to criminal conduct," § 3553(a)(2)(B), and "to protect the public from further crimes of the defendant," § 3553(a)(2)(C). For his attempted murder offense, Golden was sentenced to a mere 120 months in the first place and he was paroled, for the first time, after serving less than three-and-one-half years, then revoked twice and paroled twice more. The PSIR also indicates that Golden had a poor prison disciplinary record, including multiple disciplinary reports for assault and battery. Even if it was appropriate to parole a defendant convicted of attempted murder after only three-and-one-half years, it is clear from Golden's subsequent revocations of parole and his prison disciplinary record that he does not have any respect for the law or any ability to conform his conduct to its requirements. Thus, his ability to commit further crimes—which his record shows he assuredly will do if released—must be curtailed and the public must be protected from his further crimes.

---

[3] The court also notes that Golden's lack of a father figure is potentially mitigating, but that lack is more than offset, in the court's view, by the presence of a hard-working mother. Thus, while I have considered Golden's family circumstances in my consideration of the § 3553(a) factors, I do not find that they mitigate against an upward variance.

A final aggravating factor relates to "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). There is no indication in the PSIR that Golden's criminal conduct resulted from drug addiction. Rather, it appears to be the result of greed or at least a preference for making "easy money" dealing drugs rather than by working hard, as his mother clearly has done.

Upon consideration of the entire record and all pertinent sentencing factors, I find that Golden's motion for a downward variance based on the crack-to-powder disparity must be denied, even though in the absence of other aggravating factors, I would have sentenced him to the mandatory minimum of 120 months based on application of an "alternative" guidelines calculation using a 1:1 crack-to-powder ratio. Instead, I varied upward to 180 months of incarceration, with various other terms and conditions set out on the record at the sentencing hearing, as the sentence that, in my view, is sufficient, but not greater than necessary in this case.

The variance in this case was determined from my assessment of the § 3553(a) factors in this case, as a variance from the mandatory minimum sentence that would have been otherwise applicable using a 1:1 crack-to-powder ratio to determine the guidelines sentencing range. Indeed, had Golden not been subject to a statutory mandatory minimum sentence, I would have varied upward to the same 180-month sentence from the "alternative" guidelines sentencing range of 51 to 63 months determined by using a 1:1 crack-to-powder ratio. Thus, what the sentence accounts for, ultimately, is a fair assessment of the equivalence of crack and powder cocaine offenses generally, but with a substantial adjustment for case-specific circumstances. As such, it is comparable to the sentence I imposed, under mandatory guidelines, for comparable criminal history of a non-crack defendant. *See United States v. Flores*, 223 F. Supp. 2d 1016 (N.D. Iowa 2002) (departing from a guidelines sentencing range of 120 to 137 months, both horizontally

from Criminal History Category IV to Criminal History Category VI and vertically upward six levels, to impose a sentence of 235 months, for a defendant convicted of possessing with intent to distribute LSD who, but for his poor marksmanship, would have killed his sister's boyfriend when he shot him five times, a crime for which he had been charged with attempted murder, but pleaded down to terrorism). Although this sentence is a relatively small variance from the "standard" guidelines sentencing range, the sentence was not determined on that basis. Thus, I have not been forced to balance the excessive harshness of the guidelines range using a 100:1 ratio for crack offenses generally against the extent of the appropriate variance for case-specific factors. Moreover, while I might consider the statutory mandatory minimum sentence, which is also based on a 100:1 crack-to-powder ratio, to be excessively harsh generally, again, my upward variance from the "alternative" sentencing guideline range using a 1:1 ratio, based on case-specific factors, exceeds the statutory mandatory minimum sentence. Finally, the sentence in this case also is not the result of adopting some crack-to-powder ratio other than 1:1 or 100:1 to account for, and act as a proxy for, the case-specific circumstances, where in this case, no crack-to-powder ratio less than or even up to 100:1 would have resulted in punishment that I would have considered sufficient, but not greater than necessary, in light of the § 3553(a) factors.[4]

---

[4] Although Golden's plea agreement included an appeal waiver, the prosecution graciously acceded to my request that, in addition to the right to appeal a sentence that is illegal or constitutes a miscarriage of justice, which was maintained under the plea agreement, Golden be allowed to appeal my upward variance and whether or not the upward variance constitutes a reasonable sentence.

### *III. CONCLUSION*

Accordingly, defendant Gully was sentenced to 180 months of incarceration, with various other terms and conditions set out on the record at the sentencing hearing, as the sentence that, in my view, sufficient, but not greater than necessary in this case. This Memorandum Opinion And Order Regarding Sentencing shall be attached to and incorporated by reference, in its entirety, into an Amended Statement of Reasons and Amended Judgment in this case.

**IT IS SO ORDERED.**

**DATED** this 12th day of January, 2010.

_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA